UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSANNE MURPHY,

          Plaintiff,

                                           Case No. 11-12425

v.                                        Hon. Gerald E. Rosen

HENRY FORD HEALTH SYSTEM
and KIMBERLY BROWN,

          Defendants.

_____/

OPINION AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____February 5, 2013_____

PRESENT:  Honorable Gerald E. Rosen
                     Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Rosanne Murphy commenced this action in this Court on June 3, 2011,

alleging that her former employer, Defendant Henry Ford Health System ("HFHS"),

violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* by

terminating her employment as she attempted to return from a medical leave, and by

failing to reasonably accommodate her disability so that she could return to work.

Plaintiff has also asserted state-law claims of breach of contract and promissory estoppel

against Defendant HFHS, as well as a state-law claim of tortious interference against her

former supervisor, Defendant Kimberly Brown.  This Court's subject matter jurisdiction

rests upon Plaintiff's assertion of claims arising under the federal ADA. *See* 28 U.S.C. §§ 1331, 1367(a).

By motion filed on April 6, 2012, Defendants now seek summary judgment in their favor on Plaintiff's federal and state-law claims. In support of this motion, Defendants argue: (i) that Plaintiff has failed to raise an issue of fact as to HFHS's legitimate, non-discriminatory reason for terminating her — namely, that there was no available position for her by the time she sought to return from her medical leave; (ii) that Plaintiff never requested an accommodation of the sort that HFHS was obligated to provide under the ADA; (iii) that Plaintiff's breach of contract claim is defeated by her status as an at-will employee; (iv) that Plaintiff's claim of promissory estoppel fails for lack of evidence of detrimental reliance on any promise made by HFHS; and (v) that Plaintiff cannot show a personal benefit to Defendant Brown that could support her claim of tortious interference. Plaintiff filed a response in opposition to Defendants' motion on May 29, 2012, contending: (i) that she has produced both direct and circumstantial evidence that HFHS unlawfully acted on account of her disability in terminating her employment; (ii) that she made sufficient requests to trigger HFHS's obligation to accommodate her disability; (iii) that, regardless of Plaintiff's "at-will" status, HFHS breached its leave policy that created a legitimate expectation of job security upon Plaintiff's return from her medical leave; (iv) that this same leave policy gives rise to issues of fact, at least, as to the "promise" and "detrimental reliance" elements of Plaintiff's claim of promissory estoppel; and (v) that genuine issues of fact remain as to whether Defendant Brown acted with personal motives

2

in allegedly interfering with Plaintiff's employment relationship with HFHS.  Defendants

then filed a June 18, 2012 reply brief that further addresses these points of contention.

Having reviewed the parties' briefs in support of and opposition to Defendants'

motion, as well as the accompanying exhibits and the remainder of the record, the Court

finds that the relevant allegations, facts, and legal issues are sufficiently presented in

these written submissions, and that oral argument would not aid the decisional process.

Accordingly, the Court will resolve Defendants' motion "on the briefs."  *See* Local Rule

7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets

forth the Court's rulings of this motion.

## II.  FACTUAL BACKGROUND

### A.    The Parties

Plaintiff Rosanne Murphy was hired by Defendant Henry Ford Health System

("HFHS") in 1991, and worked as a Senior Staff Physician in HFHS's Division of

Gastroenterology.  At all relevant times, Plaintiff reported to Defendant Kimberly Brown,

the Chief of HFHS's Division of Gastroenterology and Hepatology.

The physicians in HFHS's Division of Gastroenterology work at one or more of

five facilities — Main/Detroit, Columbus/West Bloomfield, Fairlane, Lakeside, and

Taylor — and Plaintiff worked at each of these sites during her employment with HFHS.

In 1999, Plaintiff was permanently assigned to the Fairlane facility, where she remained

until her medical leave in April of 2009.  At the time she took this leave, she was the only

full-time gastroenterologist at the Fairlane facility.

3

**B.      Plaintiff Begins Her Medical Leave of Absence**

On April 22, 2009, Plaintiff was in an alcohol-related car accident.[1]  Within a few

days of the accident, Plaintiff checked into an in-patient rehabilitation facility in Brighton,

Michigan for treatment of her alcohol addiction.  In addition, Plaintiff's treating

psychiatrist, Dr. Habib Vaziri, completed a form on April 24, 2009 stating that Plaintiff

was incapacitated and unable to work due to the residual effects of an automobile

accident and anxiety disorder, and Plaintiff's brother-in-law, attorney Thomas P. Vincent,

forwarded this document to HFHS, along with a form requesting a medical leave of

absence.[2]  This paperwork did not indicate when Plaintiff might be able to return to work,

and Plaintiff has testified that she did not know at the time how long she would be away

from her job.

Plaintiff's medical leave of absence was governed by a leave of absence policy set

forth in HFHS's Physician Policy Manual.  This policy states in pertinent part:

> Staff members on medical leave of absence will have their position
> guaranteed for a period not to exceed six (6) months within a twenty-four
> (24) month period.  Once the six (6) months have expired, members who

---

[1]As a result of this incident, Plaintiff was convicted of driving under the influence of alcohol.  This was her second such offense, with Plaintiff previously having pled guilty in 2007 to driving while impaired.  Plaintiff testified at her deposition that she became addicted to alcohol in approximately 2005 or 2006, and that she began drinking excessively in late 2008 or early 2009.

[2]In an accompanying letter, Mr. Vincent stated that Plaintiff had authorized him to serve as her representative concerning "both her employment situation and her medical condition" during the course of her medical leave, and he asked HFHS to contact him "if you need any additional information either from Dr. Murphy or one of her doctors."  (Defendants' Motion, Ex. 4, 4/24/2009 Letter.)

subsequently are able to return to active status will be given consideration for placement with the HFMG.

(Plaintiff's Response, Ex. D, Medical Leave of Absence Policy.)

## C.   Plaintiff Repeatedly Extends Her Medical Leave

On June 11, 2009, attorney Vincent sent a letter to HFHS's Vice President of Medical Staff Affairs, Beth Cafaro, requesting an extension of Plaintiff's medical leave. This letter was accompanied by a statement from Plaintiff's physician, Dr. Vaziri, that Plaintiff was being treated for generalized anxiety disorder, and that, due to this condition, Plaintiff's medical leave of absence was being extended until July 27, 2009. This date came and went without HFHS receiving any further information concerning Plaintiff's medical condition.

HFHS next was advised of Plaintiff's condition in early September of 2009, when Ms. Cafaro sent an e-mail to Mr. Vincent asking him to "provide me an update on Dr. Murphy's status" and explaining that "[w]e need to move forward with transferring her patients to other providers." (Plaintiff's Response, Ex. K, 9/8/2009 E-mail.) In response, Mr. Vincent reported that Plaintiff "absolutely intends to return as soon as she is able," and that she was "excited about returning to work and she hopes to be able to do so in the next 4-6 weeks, if possible." (*Id.*) Mr. Vincent also forwarded a September 2, 2009 letter from Dr. Vaziri stating that Plaintiff remained under his care for generalized anxiety disorder, and that her "condition is progressively improving such that I am anticipating her being able to return to work beginning October 5, 2009." (Defendants' Motion, Ex.

5

28, 9/2/2009 Letter.)  On September 28, 2009, however, Mr. Vincent sent another letter to

HFHS, enclosing a statement from Dr. Vaziri that he had extended Plaintiff's medical

leave until November 30, 2009.  Mr. Vincent again emphasized in his letter that Plaintiff

was "absolutely going to return to work," and that she "hope[d] to do so, if at all possible,

by the [sic] of this fall."  (Defendants' Motion, Ex. 31, 9/28/2009 Letter.)

On November 10, 2009, Ms. Cafaro notified Mr. Vincent that Plaintiff's medical

leave had exceeded the six-month limit for a guaranteed return to her position at HFHS's

Fairlane facility, and that her duties had been assigned to another physician:

> Please be advised, that due to patient care needs and the fact that Dr.
> Murphy's Medical Leave has exceeded the six (6) month position
> guarantee[] as provided for in the HFMG Medical Leave Policy, a
> permanent replacement has been assigned to Gastroenterology Clinic at
> Fairlane Medical Facility.  Despite the replacement of her position, Dr.
> Murphy will continue on medical leave until she is deemed able to return to
> work.  Dr. Murphy can also be considered for open positions within the
> department when she is able to return.

(Defendants' Motion, Ex. 33, 11/10/2009 Letter.)  Mr. Vincent responded to Ms. Cafaro's

letter on November 16, 2009, stating in relevant part:

> . . . As you know, on September 28, 2009, I provided you with a
> copy of Dr. Vaziri's letter of the same date, in which he extended Dr.
> Murphy's Medical Leave of Absence to November 30, 2009.  Dr. Vaziri
> has now confirmed that Dr. Murphy is able to return to work and resume
> her previous full-time position at the Henry Ford Fairlane Medical Facility,
> two weeks from today, on November 30, 2009.  I will provide you with a
> copy of Dr. Va[z]iri's return to work letter under separate cover.
>
> Hopefully, Dr. Murphy's ability to return to work within the next
> two weeks will enable her to resume her previous position at Fairlane.  If
> for some reason the replacement you refer to in your letter has already
> started working in that position, please consider this letter as Dr. Murphy's

request to be considered for any other available full-time position within the
Gastroenterology Department, effective November 30, 2009.

(Defendants' Motion, Ex. 34, 11/16/2009 Letter.)[3]  Ms. Cafaro then replied to Mr.

Vincent in an e-mail sent the next day:

> I have received your letter regarding Dr. Murphy.  Unfortunately, due to
> patient needs we have placed a permanent replacement for Dr. Murphy at
> our Henry Ford Fairlane location.  Currently we do not have any open full
> time positions within the Division of Gastroenterology.  Dr. Kimberly
> Brown Division Head is currently interviewing candidates for anticipated
> open positions beginning in July of 2010.  If Dr. Murphy is interested in
> discussing these positions with Dr. Brown, I would suggest she contact Dr.
> Brown.

(Defendants' Motion, Ex. 35, 11/17/2009 E-mail.)[4]

As an evident follow-up to Ms. Cafaro's suggestion in her e-mail, Plaintiff

promptly contacted Defendant Brown's secretary on November 17, 2009 to arrange a

meeting.  Despite Plaintiff's repeated phone calls, Dr. Brown did not meet with Plaintiff

until over two months later, on January 26, 2010.  At this meeting, Plaintiff informed Dr.

Brown that she had undergone treatment for alcohol addiction during her leave, and that

she had self-reported this addiction to the Health Professional Recovery Program

("HPRP"), a program established under Michigan law that provides assistance, treatment,

---

[3]Contrary to Mr. Vincent's statement in this letter, nothing in the record indicates that
HFHS was provided with a "return to work letter" from Dr. Vaziri confirming that Plaintiff was
able to return to work on November 30, 2009.

[4]As discussed in greater detail below, Plaintiff takes issue with the statement in this e-
mail (and in Ms. Cafaro's earlier November 10, 2009 letter) that HFHS already had "placed a
permanent replacement" for Plaintiff at its Fairlane facility, as well as Ms. Cafaro's further
assertion that HFHS "[c]urrently . . . d[id] not have any open full time positions within the
Division of Gastroenterology."

and monitoring to Michigan health care professionals with addictions or mental health issues.[5]  Plaintiff also advised Dr. Brown that she "was anticipating coming back to work" and "wanted to come back to work."  (Plaintiff's Response, Ex. 7, Plaintiff's Dep. at 134.)  In response, Dr. Brown told Plaintiff that her position at the Fairlane facility had been filled, but she advised Plaintiff that "when she was able to come back to work, . . . she should contact me and we could consider her for openings at that time, whenever that might be."  (Defendants' Motion, Ex. 3, Brown Dep. at 139.)[6]

In the midst of Plaintiff's effort to meet with Dr. Brown and discuss her return to work, Plaintiff's psychiatrist once again extended her medical leave.  In an e-mail dated November 25, 2009, Mr. Vincent informed Ms. Cafaro that although he was "previously hopeful that Dr. Murphy would be released to return to work by November 30, 2009," Plaintiff had been advised at "her most recent visit" to her physician that "her medical leave will have to be extended to February 1, 2010, possibly longer."  (Defendants' Motion, Ex. 36, 11/25/2009 E-mail.)  A November 25, 2009 letter from Plaintiff's psychiatrist confirmed that her medical leave had been extended to February 1, 2010.

---

[5]Plaintiff entered into a monitoring agreement through this program, under which she agreed to obtain HPRP's approval of any conditions of or changes in her employment.  (*See* Defendants' Motion, Ex. 39, Monitoring Agreement.)  She also agreed to practice medicine only under HPRP-approved supervisory conditions to be determined upon her return to work.  (*See id.*)

[6]Dr. Brown testified that she specifically asked Plaintiff at this meeting whether she had been released to return to work, and that Plaintiff responded that she had not.  (*Id.* at 139.)  Plaintiff testified, in contrast, that she told Dr. Brown that she "was ready to come back to work."  (Plaintiff's Dep. at 172.)

8

(Defendants' Motion, Ex. 37, 11/25/2009 Letter.)[7]

**D.    Dr. Brown and Ms. Cafaro Communicate During Plaintiff's Medical Leave Concerning Plaintiff's Job Status and Possible Return to Work**

Throughout the period of Plaintiff's medical leave, Dr. Brown and Ms. Cafaro exchanged e-mails regarding Plaintiff's employment status and possible return to work. First, just two days after the April 22, 2009 auto accident that precipitated Plaintiff's leave, Dr. Brown sent Ms. Cafaro an e-mail stating:

> Hi, can you help with the steps to let Dr. Murphy go?  I have tried and tried, but the patient complaints continue and her behavior continues to be a problem.  I think she may need some time away from medicine or with a different group for employment . . . .   I am not sure of the next steps and want to make sure the HR thing is followed correctly.

(Plaintiff's Response, Ex. E, 4/24/2009 E-mails.)[8]  Ms. Cafaro responded later that same day, stating that "I feel your frustration," and agreeing that "[i]t is time to come up with a transition plan."  (*Id.*)[9]  In an e-mail exchange a few days later confirming a scheduled

[7]This letter was authored by Dr. Neel Jolepalem, who explained that Plaintiff's regular psychiatrist, Dr. Vaziri, was out on sabbatical.

[8]Although this e-mail references continuing "patient complaints," Dr. Brown conceded at her deposition that she was aware at the time of only a single patient complaint lodged against Plaintiff earlier in 2009.  (*See* Brown Dep. at 146-47.)  In addition, Plaintiff had received what Ms. Cafaro characterized as a "good" performance review from Dr. Brown on April 20, 2009, just four days before Dr. Brown sent this e-mail.  (*See* Plaintiff's Response, Ex. 3, Cafaro Dep. at 122; *see also* Plaintiff's Response, Ex. A, 4/20/2009 Performance Review.)  On the other hand, Plaintiff had been placed on a "Performance Improvement Plan" in June of 2007 that noted concerns with Plaintiff's lack of adherence to HFHS's vacation and leave policies, and this 24-month plan remained in effect at the time Plaintiff began her medical leave.  (*See* Defendants' Motion, Ex. 16, 6/20/2007 Performance Improvement Plan.)

[9]As Defendants point out in their reply brief, there is no evidence that Dr. Brown and Ms. Cafaro were aware of Plaintiff's auto accident and request for medical leave when they exchanged these April 24, 2009 e-mails.

meeting to discuss Plaintiff's status, Dr. Brown advised Ms. Cafaro:

> . . . [Plaintiff] was in a car accident (her lawyer brother in law informed us).
> He informed us she would need a month off to recover from the "residual".
> It continues to be bizarre.  I think it's time she find another position.
> Maybe that will prompt her to get the help I think she needs.

(Plaintiff's Response, Ex. F, 4/29/2009 E-mail.)

Just over a month later, Dr. Brown and Ms. Cafaro revisited the subject of

Plaintiff's employment status.  In an e-mail dated June 3, 2009, Dr. Brown wrote:

> Regarding the person we have met about numerous times, how long before
> they return to work can we discuss with them the need for them to find a
> new job?

(Plaintiff's Response, Ex. G, 6/3/2009 E-mails.)  Ms. Cafaro responded:

> If and when they return we will come up with a transition strategy.  In our
> fantasy they just decide not to come back but knowing that both of us must
> have done something in our past that doesn't allow for the easy road we will
> think of something.

(*Id.*)

Dr. Brown and Ms. Cafaro again exchanged e-mails on this matter in early

September, as Plaintiff entered her fifth month of medical leave.  On September 2, 2009,

Dr. Brown sent an e-mail to Ms. Cafaro stating:

> I have not heard anything from [Plaintiff] or her lawyer.  What's up?  This
> has been very disruptive to our scheduling and coverage at Fairlane.  I am
> currently looking to replace her completely although the hire wouldn't start
> until July 2010.  What are my legal and system responsibil[i]ties to
> employing her should she ever decide to come back?

10

(Plaintiff's Response, Ex. I, 9/2/2009 E-mail;[10] *see also* Plaintiff's Response, Ex. J,

9/8/2009 E-mails (Dr. Brown asking Ms. Cafaro to "find out what is happening with our

friend" and stating that "I am interviewing for replacements for her").)  Ms. Cafaro

responded that she had e-mailed Mr. Vincent for a status update, and she noted that

Plaintiff "[o]nly has a 6 month job guar[a]ntee."  (Plaintiff's Response, Ex. J, 9/8/2009 E-

mails.)  Dr. Brown then replied:

> [N]ot 6 mo[nths] yet.  [M]y major concern is most of what you know.  [I]n
> addition, she has a past history of taking a summer off to be with her kids.  I
> am concerned now that the summer is over and the kids are back to school,
> this is when she will return.  [A]s we discussed previously, my intent prior
> to her leaving was to have her find a new position.  I will need some
> assistance from you if and when she returns.  [T]hanks.

(*Id.*)

    Just before Plaintiff completed her first six months of medical leave, Dr. Brown

and Ms. Cafaro again communicated concerning HFHS's handling of Plaintiff's possible

return to work.  On October 15, 2009, Dr. Brown wrote to Ms. Cafaro:

> Regarding the Fairlane position, due to the absence of Dr. Murphy for
> greater than 6 months, I have begun the interview process for a replacement
> at that site.  I am prepared to offer a position to one of the candidates.  This
> person will start in July after completing fellowship.  As you know, for
> physicians, this is the cycle of interview and hire as most candidates
> interview in the Fall of their 3rd year and start July 1 after completing
> fellowship.  Please advise if there is anything more I need to provide you
> regarding this issue.

(Plaintiff's Response, Ex. O, 10/15/2009 E-mails.)  Ms. Cafaro responded later that day,

---

[10]This e-mail message was copied to Robert Hawkins, HFHS's Practice Administrator for
the Division of Gastroenterology.

stating that the "[o]nly problem is [Plaintiff] will probabl[y] return before that," and asking Dr. Brown whether "we have someone in that [Fairlane] position now." (*Id.*) Dr. Brown replied:

> You need to clarify the rules for me.  Do we guarantee a job anywhere in the system for 1 year or do we guarantee return to the same position for 1 year?  I thought positions were guaranteed for 6 months?  Because of the cycle time for interviewing physicians and hiring, we are currently covering [Plaintiff's] position, but I cannot continue to wait to interview and offer a replacement position as I would miss the opportunity to hire should I continue to cover and wait.  If you are saying we have to guarantee a position within the system for 1 year, then she will have to work at another satellite when and if she returns and the job requirements as far as rotating on service, call, etc will be different.  Having said that, the job requirements will remain in line with what is expected of the rest of the group.  I don't think it [is] a good idea to put her back at Fairlane given the history between her and her coworkers there.

(*Id.*)

### E.    HFHS Reassigns a Physician to the Fairlane Facility To Assume a Portion of Plaintiff's Patient Load, and Also Interviews and Hires Gastroenterologists for Its Fairlane and Other Facilities

As alluded to in the e-mails exchanged between Dr. Brown and Ms. Cafaro, HFHS took various actions during the course of Plaintiff's medical leave to obtain coverage for her patients and to identify and hire a permanent replacement who could assume Plaintiff's duties at the Fairlane facility.  For the first several months of Plaintiff's leave, her patient care responsibilities were handled by a "hodgepodge" of physicians from HFHS's other facilities.  (Brown Dep. at 120.)  In the latter part of 2009, one of these HFHS physicians, Dr. Allen Yudovich, began to routinely work one or two days a week at the Fairlane facility, and this increased to three days a week in December of 2009 or

12

January of 2010. (*See id.* at 120-21; *see also* Plaintiff's Response, Ex. 10, Yudovich Dep. at 31-32.) Dr. Yudovich has testified that he "did not see [him]self as [Plaintiff's] replacement," and that he instead "was under the impression that I was providing coverage, because at that time I was not sure that Dr. Murphy was not coming back." (Yudovich Dep. at 23-24.)

In October of 2009, Dr. Brown interviewed Dr. Radhika Aggarwal for a full-time position as gastroenterologist at HFHS's Fairlane facility. (*See* Brown Dep. at 153.) In a letter dated November 23, 2009, HFHS officials offered this position to Dr. Aggarwal, with a designated start date of July 1, 2010. (*See* Plaintiff's Response, Ex. T, 11/23/2009 Letter.)[11] Dr. Aggarwal accepted this offer on January 24, 2010, (*see id.),* and apparently began working at HFHS's Fairlane facility in July of 2010.[12]

---

[11]Dr. Brown explained at her deposition that this extended period between the offer to Dr. Aggarwal and her scheduled start date was customary where the physician being interviewed was completing the final few months of a fellowship. (*See* Brown Dep. at 161-62.) Dr. Brown testified that "[f]or fellows coming out of fellowship, the interview process starts in the fall," and that "[m]ost contracts are signed somewhere between November and January, usually, and the start date is July." (*Id.* at 162.)

[12]As observed in Plaintiff's brief in response to Defendants' motion, this record casts considerable doubt on Ms. Cafaro's statement in a November 10, 2009 letter to Mr. Vincent that "a permanent replacement [for Plaintiff] has been assigned to Gastroenterology Clinic at Fairlane Medical Facility," (Defendants' Motion, Ex. 33, 11/10/2009 Letter), as well as her assertion in a subsequent November 17, 2009 e-mail that "we have placed a permanent replacement for Dr. Murphy at our Henry Ford Fairlane location," (Defendants' Motion, Ex. 35, 11/17/2009 E-mail). It also indicates that Defendants and their counsel have, at best, distorted the true facts by stating in the brief in support of their summary judgment motion that Dr. Brown "interviewed and subsequently hired Dr. Radhika Aggarwal to replace the remaining portion of Plaintiff's duties *in October 2009."* (Defendants' Motion, Br. in Support at 7 n.2 (emphasis added).)

In fact, at the time Ms. Cafaro made her statements on November 10 and 17, 2009, an offer had not yet been extended to Dr. Aggarwal to fill the full-time gastroenterologist position at

During this same time period in the fall of 2009, HFHS also interviewed and extended offers to other gastroenterologists for positions at its other facilities. As summarized in a chart in Plaintiff's brief in response to Defendants' motion, between November 4 and December 8, 2009, HFHS made offers to three other gastroenterologists (in addition to Dr. Aggarwal) who began to work at HFHS's Lakeside, Columbus Center, and Taylor facilities in the summer or early fall of 2010. (*See* Plaintiff's Response Br. at 19-20; *see also* Plaintiff's Response, Exs. W, X, Y (offer letters).)[13]

## F.   Plaintiff's Employment Is Terminated Within Days After She and Her Physician Notify HFHS That She Is Ready to Return to Work

On April 16, 2010, Plaintiff's physician noted in her medical record that she was doing well and was ready to return to work. By letter dated April 19, 2010, Plaintiff advised Dr. Brown that she was "able to return to work full time to perform all duties with no restrictions," (Defendants' Motion, Ex. 41, 4/19/2010 Letter), and she enclosed a letter from her physician confirming that she could "resume full work load/activities effective 04-16-10" with "no restrictions," (Defendants' Motion, Ex. 41, 4/16/2010

---

the Fairlane facility. Indeed, Defendants have expressly admitted in the brief in support of their summary judgment motion that "there were open positions within the Gastroenterology department during the Fall of 2009." (Defendants' Motion, Br. in Support at 16.) Likewise, Ms. Cafaro acknowledged at her deposition that there was an open gastroenterologist position at Fairlane at the time she wrote to Mr. Vincent in mid-November of 2009. (*See* Plaintiff's Response, Ex. 3, Cafaro Dep. at 100.)

[13]More generally, Plaintiff asserts that HFHS has hired at least ten gastroenterologists since 2009. (*See* Plaintiff's Response Br. at 19.) She acknowledges, however, that she was not qualified for all ten of these positions, "as some involved subspecialties (i.e., interventional gastroenterology) outside of [Plaintiff's] expertise." (*Id.* at 19 n.25.)

Return-to-Work Letter.)  In response, Plaintiff was informed that there were no available positions for which she could be considered, as contracts had gone out to and been signed by other physicians who were scheduled to begin their employment with HFHS in July of 2010.  (*See* Brown Dep. at 139-40.)  HFHS then terminated Plaintiff's employment on April 24, 2010, the one-year anniversary of the commencement of her medical leave, on the ground that she had exhausted the full year of leave time made available under the pertinent HFHS policies and practices.  (*See* Defendants' Motion, Ex. 5, 5/11/2010 Letter.)  This lawsuit followed, with Plaintiff alleging that she was discharged in violation of the ADA, and also seeking to recover under the state-law theories of wrongful discharge, promissory estoppel, and tortious interference.

### III.  ANALYSIS

**A.    The Standards Governing Defendants' Motion**

Through the present motion, Defendants seek an award of summary judgment in their favor on Plaintiff's federal ADA claims and on each of her state-law claims.  Under the pertinent Federal Rule, summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548,

15

2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

### B. Plaintiff's ADA Claim of Discriminatory Discharge Fails for Lack of Evidence That HFHS's Legitimate, Non-Discriminatory Reason for Plaintiff's Termination Was Pretextual.

In count I of her complaint, Plaintiff asserts two different theories of recovery against HFHS under the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[14] First, she alleges that HFHS discriminated against her and terminated her

---

[14]To the extent that Plaintiff's complaint could be viewed as advancing ADA claims against Defendant Brown, she has acknowledged in her response to Defendants' motion that her ADA claims are being pursued against HFHS only.

employment "on the basis of [her] disability," in violation of 42 U.S.C. § 12112(a). Next, she alleges that HFHS breached its obligation under the ADA to reasonably accommodate her disability. *See* 42 U.S.C. § 12112(b)(5)(A). The Court addresses each of these theories of recovery in turn.

Regarding Plaintiff's claim of disability discrimination, in the absence of direct evidence of such discrimination,[15] this claim is governed by the familiar tripartite analytical framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). *See Hedrick v. Western Reserve Care System,* 355 F.3d 444, 453 (6th Cir. 2004). To establish a *prima facie* case at the first stage of this analysis, Plaintiff must show (i) that she had a disability within the meaning of the ADA, (ii) that she was qualified to perform the job she held prior to her discharge, with or without reasonable accommodation, and (iii) that she suffered an adverse employment decision, (iv) that HFHS knew or had reason to know of her disability, and (v) that her former position remained open while HFHS sought other applicants or she was replaced. *See Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312 (6th Cir. 2012).

In this case, the parties are agreed that alcoholism is an impairment that qualifies Plaintiff for protection under the ADA, and Defendants further acknowledge, at least for

---

[15]In this case, Plaintiff contends that she has produced direct evidence of HFHS's discrimination against her on account of her disability. The Court addresses this issue below.

purposes of the present motion, that Plaintiff can establish the remaining elements of her *prima facie* case. Thus, at the second stage of the *McDonnell Douglas* analysis, HFHS must identify a legitimate, non-discriminatory explanation for its action. *See Monette,* 90 F.3d at 1186. It has met this burden of production by pointing to Plaintiff's exhaustion of the one year of medical leave made available to her under the pertinent HFHS policies and practices, and by asserting that there was no vacant position in which to place Plaintiff upon the expiration of this one year of leave. (*See* Defendants' Motion, Ex. 5, 5/11/2010 Letter.)[16]

With HFHS having articulated a legitimate, non-discriminatory reason for Plaintiff's discharge, "the remaining question is whether that reason was simply a pretext designed to mask discrimination." *Jones v. Potter,* 488 F.3d 397, 406 (6th Cir. 2007). Plaintiff may meet her burden of establishing pretext by producing evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate h[er] discharge, or (3) that they were insufficient to motivate discharge." *Jones,* 488 F.3d at 406 (internal quotation marks and citation omitted).

In an effort to satisfy this burden, Plaintiff points to a variety of evidence that, in her view, shows that HFHS's stated reason for her discharge had no basis in fact and did

---

[16]Although it might seem that a policy or practice calling for the termination of an employee upon his or her use of a maximum amount of leave would tend to discriminate against employees whose disabilities give rise to a need for medical leave, the Sixth Circuit has held that an employer does not run afoul of the ADA by invoking a "uniform policy that requires termination of any employee who does not return to work at the expiration of a leave period." *See Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046 (6th Cir. 1998).

not truly motivate this adverse action.  First and foremost, she cites the e-mails exchanged between her supervisor, Dr. Brown, and Beth Cafaro during her medical leave, which Plaintiff views as evidencing "dishonest behind the scenes maneuvering designed to ensure that [Plaintiff] did not return" to her position at HFHS at the conclusion of her medical leave.  (Plaintiff's Response Br. at 28.)  As recounted earlier, these e-mails reveal (i) Dr. Brown's interest in learning "the steps to let Dr. Murphy go," (Plaintiff's Response, Ex. E, 4/24/2009 E-mails), (ii) her belief that "it's time [Plaintiff] find[s] another position," (Plaintiff's Response, Ex. F, 4/29/2009 E-mail), (iii) her desire to "discuss with [Plaintiff] the need for [her] to find a new job," (Plaintiff's Response, Ex. G, 6/3/2009 E-mails), (iv) her effort to "replace [Plaintiff] completely although the hire wouldn't start until July 2010," (Plaintiff's Response, Ex. I, 9/2/2009 E-mail), and (v) her statement of her "intent prior to [Plaintiff] leaving [on her medical leave] . . to have her find a new position," (Plaintiff's Response, Ex. J, 9/8/2009 E-mails).  According to Plaintiff, these e-mails "confirm[] that the decision to oust [her] was made just days into her medical leave, many months before she had even arguably exhausted her leave." (Plaintiff's Response Br. at 28.)

To be sure, Dr. Brown's e-mails to Ms. Cafaro reflect her repeatedly expressed wish that Plaintiff should find another position upon her return from medical leave, either at another HFHS facility or perhaps with a new employer.  Yet, once Plaintiff remained on medical leave for more than six months, HFHS was no longer obligated under its medical leave policy to return Plaintiff to her former position at the Fairlane facility, but

19

instead was required only to consider placing her in a vacant position at this or some other HFHS facility.  Then, after Plaintiff's medical leave continued for a full year, HFHS asserts that its policies and practices did not mandate a further, indefinite extension of Plaintiff's leave until a position became available for her, but that these policies and practices instead called for Plaintiff's discharge in the event that there were no available openings for a gastroenterologist at any of HFHS's facilities.

Accordingly, whatever Dr. Brown might have desired with respect to Plaintiff's return from medical leave, her statements on this subject during the course of Plaintiff's leave do not tend to refute or otherwise undermine HFHS's appeal to its uniform, facially neutral, and non-discriminatory practice of discharging an employee after one year of leave unless there is a vacant position into which this employee can be placed.[17] Although Dr. Brown may have gotten her wish, and although her e-mails could arguably be read as evidencing her animus toward Plaintiff arising in part from Plaintiff's disability,[18] Plaintiff fails to explain why Dr. Brown's arguably discriminatory views

---

[17]Plaintiff separately disputes whether HFHS has consistently adhered to this practice. The Court addresses this question below.

[18]Defendants dispute this reading of Dr. Brown's e-mails, observing that when she sent her first e-mail on April 24, 2009 asking for Ms. Cafaro's "help with the steps to let Dr. Murphy go," there is no evidence that she knew at the time that Plaintiff had been in an auto accident and was about to go on medical leave.  Defendants also point to Plaintiff's acknowledgment at her deposition that the first time she advised Dr. Brown of the reason for her leave — *i.e.,* treatment for alcoholism — was at their January 26, 2010 meeting, (*see* Plaintiff's Dep. at 216-17), well after Dr. Brown sent her various e-mails to Ms. Cafaro expressing her desire that Plaintiff not be permitted to return to her former position at the Fairlane facility.  In addition, Defendants note that Plaintiff had been placed on a performance improvement plan that remained in effect at the time of her medical leave.

toward her should detract from or defeat HFHS's ability to apply its customary leave-related policies and practices to Plaintiff once she remained unable to work for a full year. Simply stated, Dr. Brown's "rooting interest" in the outcome here did not, by itself, prevent HFHS from lawfully achieving this outcome, so long as it did so through means that were uninfluenced by Dr. Brown's purported discriminatory bias.

Plaintiff insists, however, that the record belies HFHS's stated justification for discharging her on the one-year anniversary of her medical leave — namely, that there were "no open positions in Gastroenterology" at the conclusion of this one-year period. (Defendants' Motion, Ex. 5, 5/11/2010 Letter.)  Instead, Plaintiff contends that HFHS "continued to hire other gastroenterologists" at around this time, and that even her "own position at Fairlane was not filled until July 2010 (by [Dr.] Aggarwal)."  (Plaintiff's Response Br. at 28.)  Yet, of the five other gastroenterologists (including Dr. Aggarwal) identified by Plaintiff as involved in this hiring effort, (*see* Plaintiff's Response Br. at 19-20, 28), HFHS extended offers to four of these physicians in November or December of 2009, and each of these offers was accepted by early March of 2010.  (*See* Plaintiff's Response, Ex. T (offer made 11/23/2009, accepted 1/24/2010); Ex. W (offer made 11/6/2009, accepted 12/3/2009); Ex. X (offer made 11/6/2009, accepted 12/3/2009); Ex.

---

Against this backdrop, Defendants maintain that Dr. Brown's e-mails are more properly read as reflecting dissatisfaction with Plaintiff's job performance that pre-dated Plaintiff's medical leave and her disclosure of her disability, as opposed to any animus toward Plaintiff arising from this disability.  The Court finds it unnecessary to delve further into this question of Dr. Brown's intent as reflected in her e-mails, in light of its resolution of Plaintiff's ADA claims on other grounds.

Y (offer made 12/8/2009, accepted 3/5/2010).)  This round of hiring, then, was fully completed more than a month before Plaintiff notified HFHS on April 19, 2010 that she was ready to return to work.[19]  The fifth gastroenterologist identified by Plaintiff, Dr. Schairer, was not offered a position until March 28, 2011, nearly a year after the conclusion of Plaintiff's medical leave.  (*See* Plaintiff's Response, Ex. Z.)  Accordingly, this record confirms, rather than refutes, HFHS's assertion that when Plaintiff returned from her medical leave in mid-April of 2010, there were no available gastroenterologist positions for which Plaintiff could have been considered, whether at that time or on the immediate horizon.

Nonetheless, Plaintiff finds it significant that several of these offers — including, most notably, the November 23, 2009 offer to Dr. Aggarwal for a position at the Fairlane

---

[19]As Plaintiff points out, while these physicians (including Dr. Aggarwal) had already accepted offers of employment before the conclusion of Plaintiff's leave, they did not actually begin to work at HFHS until the summer or early fall of 2010.  In Plaintiff's view, then, these positions were not "filled" until after Plaintiff notified HFHS that she was ready to return to work.

As discussed earlier, however, this gap between offers and actual commencement of employment was a byproduct of the standard process for interviewing and hiring physicians who were in the midst of completing a fellowship.  (*See* Brown Dep. at 161-62; *see also* Plaintiff's Response, Ex. O, 10/15/2009 E-mails (Dr. Brown opining that she "would miss the opportunity to hire should I continue to cover [Plaintiff's patient load] and wait" to interview replacements).) Given the time constraints introduced by this process, and given the uncertainty surrounding the date when Plaintiff might return from her leave, HFHS was under no obligation to refrain from interviewing and extending offers to replacements in the hope that Plaintiff would soon be ready to resume her duties.  *See, e.g., Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000) (explaining that if no positions are presently available to an employee with a disability, an employer's obligation extends only to positions that are expected to "become vacant within a reasonable amount of time"); *Gantt*, 143 F.3d at 1047 (observing that the ADA "does not require the employer to wait indefinitely for an employee's medical condition to be corrected").

facility — had not yet been made when Plaintiff's attorney, Mr. Vincent, notified HFHS in a November 16, 2009 letter that Plaintiff's physician had "confirmed that Dr. Murphy is able to return to work and resume her previous full-time position at the Henry Ford Fairlane Medical Facility, two weeks from today, on November 30, 2009." (Defendants' Motion, Ex. 34, 11/16/2009 Letter.) In Plaintiff's view, this letter evidenced her readiness to return to work in mid-November of 2009, at a time when Defendants themselves concede that gastroenterologist positions were available, both at the Fairlane facility and elsewhere. (*See* Defendants' Motion, Br. in Support at 16 (acknowledging that "there were open positions within the Gastroenterology department during the Fall of 2009"); Cafaro Dep. at 100 (agreeing that there was an open gastroenterologist position at Fairlane at the time Mr. Vincent sent his November 16, 2009 letter).) Thus, Plaintiff contends that HFHS's claim of a lack of available positions had no basis in fact.

Yet, regardless of what Plaintiff or her attorney might have hoped or believed in mid-November of 2009, the brute fact remains that Plaintiff did not appear for work on November 30, 2009 as anticipated in Mr. Vincent's November 16, 2009 letter.[20] Rather, on November 25, 2009, Mr. Vincent notified Ms. Cafaro that while he was "previously hopeful that Dr. Murphy would be released to return to work by November 30, 2009," Plaintiff instead had been advised "at her most recent visit" to her physician "that her

---

[20]In addition, the record indicates that Mr. Vincent never provided HFHS with a letter from Plaintiff's physician confirming that she would be ready to return to work on November 30, 2009, despite Mr. Vincent's promise in his November 16, 2009 letter to Ms. Cafaro that he would forward this "return to work letter under separate cover." (Defendants' Motion, Ex. 34, 11/16/2009 Letter.)

medical leave will have to be extended to February 1, 2010, possibly longer."
(Defendants' Motion, Ex. 36, 11/25/2009 E-mail.)[21]  Consistent with this development,
Plaintiff remained off the job and on paid medical leave for several more months, until
mid-April of 2010.

Accordingly, while Ms. Cafaro has acknowledged the inaccuracy of her
representations in her mid-November correspondence with Mr. Vincent that HFHS had
already hired a permanent replacement for Plaintiff at its Fairlane facility and that there
were no open positions in the Division of Gastroenterology at that time, (*see* Defendants'
Motion, Ex. 33, 11/10/2009 Letter; Ex. 35, 11/17/2009 E-mail), these misstatements of
the facts as they stood in November of 2009 do not cast doubt on the veracity of HFHS's
stated reason for discharging Plaintiff when she returned from her medical leave in mid-
April of 2010.  Most importantly, the gastroenterologist positions that remained open in
November of 2009 had been filled by early March of 2010, over a month before Plaintiff
returned from her leave.  HFHS's prior misrepresentations as to the lack of available
positions — like Dr. Brown's expressions at various points in 2009 of her desire that
Plaintiff not be permitted to return to her position at the Fairlane facility — simply have
no bearing upon the truthfulness of the reason given by HFHS for terminating Plaintiff's
employment in April of 2010.  The accuracy of this stated basis for Plaintiff's discharge
must be assessed against the backdrop of facts and circumstances presented at the time

---

[21]This statement by Mr. Vincent was confirmed in a November 25, 2009 letter from
Plaintiff's physician stating that Plaintiff's medical leave had been extended to February 1, 2010.
(*See* Defendants' Motion, Ex. 37, 11/25/2009 Letter.)

24

this decision was made, and not as they stood several months earlier, when Plaintiff had

not yet presented herself as ready to return to work.[22]

Finally, Plaintiff challenges HFHS's appeal to its customary "policy and practice"

of terminating an employee upon his or her exhaustion of one year of leave, (Defendants'

_____

[22]In the fact portion of her brief in opposition to Defendants' motion, Plaintiff asserts that HFHS "[c]ause[d]" a delay in her return from her medical leave by falsely advising her in mid-November of 2009 that her position had already been filed, and by interviewing gastroenterologists to replace her despite the notification from her attorney that she would be ready to return to work on November 30, 2009. (Plaintiff's Response Br. at 16-17.) In particular, Plaintiff points to her deposition testimony that when she received Ms. Cafaro's November 10, 2009 letter stating that her position at the Fairlane facility had been filled, this information "sent me further . . . into a depression," (Plaintiff's Dep. at 133, 139-41), and she suggests that this contributed to her inability to return to work on November 30, 2009 as previously anticipated.

The record fails in a number of respects to support this proposed causal connection between HFHS's misstatements concerning the availability of Plaintiff's position at the Fairlane facility and the extension of Plaintiff's medical leave beyond the end of November. First, the only evidence identified by Plaintiff as forging this link is her own deposition testimony. Although Plaintiff is a physician, she presumably is not qualified to offer a medical opinion as to the impact of any particular episode in her life on her mental condition, nor as to whether this episode contributed to her inability to return to work and corresponding need to remain on leave.

Moreover, the medical record lends no support to Plaintiff's suggestion that she might have returned to work earlier but for HFHS's misstatements. As noted earlier, while Plaintiff's counsel promised in his November 16, 2009 letter to produce a letter from Plaintiff's physician confirming her ability to return to work as of November 30, 2009, the record includes no such statement from a health care professional attesting to Plaintiff's readiness to work on that date. Thus, there is no benchmark against which to measure Plaintiff's assertion that her condition worsened in the latter part of November, whether because of HFHS's actions or for any other reason. Certainly, in the November 25, 2009 correspondence from Plaintiff's counsel and physician relaying the medical determination that Plaintiff would not be able to return to work at the end of the month, and that her leave would instead have to be extended to at least February 1, 2010, there was no suggestion that this development was attributable to any actions taken by HFHS. Neither has Plaintiff pointed to anything else in the medical record that might evidence the judgment of her physicians that HFHS's misstatements exacerbated her condition or brought about a delay in her ability to return to work. Rather, this asserted connection is wholly speculative, and cannot be considered by the Court in resolving Defendants' present motion.

Motion, Ex. 5, 5/11/2010 Letter), suggesting that HFHS has deviated from this practice on other occasions. In support of this challenge, Plaintiff cites Ms. Cafaro's deposition testimony that (i) during her last five years of employment at HFHS, she was aware of perhaps "[f]ive to ten" other physicians who had taken leaves lasting six months or more, and (ii) that she could not recall any of these other physicians being terminated on the ground that there was no available position to which they could return at the conclusion of their leave. (Cafaro Dep. at 40, 44.) This testimony, however, does not address the precise situation presented upon Plaintiff's return from her leave — namely, that this leave had not just exceeded the six-month period during which a return to the same position is guaranteed, but had lasted the full year granted under HFHS's policies and procedures. Even assuming HFHS has permitted other physicians to return to work after taking leaves lasting six months or more, Plaintiff has not pointed to evidence of other physicians who (like her) took a full year of leave but (unlike her) were allowed to resume the same or a comparable position with HFHS. Consequently, this claim of pretext, like Plaintiff's other challenges to HFHS's legitimate, non-discriminatory reason for Plaintiff's discharge, fails for lack of supporting evidence.

This leaves only the possibility that Plaintiff might avoid the need to satisfy the *McDonnell Douglas* standard for proving discrimination through circumstantial evidence, and might instead be able to present direct evidence of discrimination against her on the basis of her disability. The Sixth Circuit has defined direct evidence as "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a

26

motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003).

In this case, Plaintiff points to the e-mail exchanges between Dr. Brown and Ms. Cafaro in April of 2009 as purportedly direct evidence of disability discrimination, construing certain statements in these e-mails as "admissions that [Dr. Brown and Ms. Cafaro] intended to fire [Plaintiff] because they regarded her as being disabled." (Plaintiff's Response Br. at 26.) More specifically, Plaintiff cites Dr. Brown's statements (i) that she needed help from Ms. Cafaro "with the steps to let Dr. Murphy go," opining that Plaintiff "may need some time away from medicine or with a different group for employment," (Plaintiff's Response, Ex. E, 4/24/2009 E-mails), and (ii) that "I think it's time she find another position," because "[m]aybe that will prompt her to get the help I think she needs," (Plaintiff's Response, Ex. F, 4/29/2009 E-mails). In Plaintiff's view, these references to Plaintiff needing "time away from medicine" and "get[ting] the help I think she needs" reveal that Dr. Brown was motivated, at least in part, by impermissible considerations of Plaintiff's disability.

27

Even accepting this reading of Dr. Brown's statements, however,[23] this evidence bears only indirectly, at best, on the motivation for the employment action giving rise to Plaintiff's claim of discrimination — namely, her discharge in April of 2010.  Nearly a year passed between Dr. Brown's statements and the termination of Plaintiff's employment.  During this lengthy period, Plaintiff's medical leave was extended on multiple occasions, necessitating an effort by HFHS to identify other physicians who could cover Plaintiff's patient load.  When Plaintiff remained on leave for over six months, she was no longer guaranteed under HFHS's medical leave policy to return to her former position at the Fairlane facility, and the uncertainty regarding Plaintiff's status and ability to return to work naturally led HFHS to begin searching for a permanent replacement.  By the time Plaintiff notified HFHS that she was ready to return to work after a full year of leave, this effort to hire a replacement for Plaintiff had run its course, and HFHS also had interviewed for and filled gastroenterologist positions at its other facilities.  In addition, Plaintiff's full year of medical leave had triggered HFHS's customary policy and practice to terminate an employee after one year of leave if there was no available position in which to place her.

Against this evidentiary backdrop, it is difficult to see how Dr. Brown's allegedly discriminatory statements in April of 2009 could shed any light whatsoever on the

---

[23]As noted earlier, Defendants question whether this is a valid interpretation of Dr. Brown's statements, particularly considering that (i) Dr. Brown evidently made the first of these statements before she was even aware that Plaintiff had been in an auto accident and was about to go on medical leave, and (ii) the second statement was made without knowledge that Plaintiff was being treated for alcoholism while on her medical leave.

decision in April of 2010 to terminate Plaintiff's employment.  *See Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1025-26 (6th Cir. 1993) (holding that discriminatory remarks made "nearly a year before" a challenged employment decision could not support an inference of discrimination).  It is clear, at a minimum, that any such posited connection would not be direct, but instead would require a number of inferences.  Most notably, a trier of fact would have to infer that Plaintiff's discharge was not, in fact, attributable to the operation of HFHS's customary policy and practice governing employees who remain on leave for a full year, but that it was instead engineered by Dr. Brown in accordance with the discriminatory views purportedly expressed in her statements to Ms. Cafaro a year earlier.  Because these statements fail to qualify as direct evidence of an improper motivation for Plaintiff's discharge, and because Plaintiff has failed to satisfy the *McDonnell Douglas* standard for establishing her claim of discriminatory discharge through circumstantial means, Defendant HFHS is entitled to summary judgment in its favor on Plaintiff's ADA claim of discriminatory discharge.

**C.    Plaintiff Has Failed as a Matter of Law To Produce Evidence of HFHS's Failure to Reasonably Accommodate Her Disability.**

Plaintiff's remaining claim under the ADA rests upon an employer's statutory obligation to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business."  42 U.S.C. § 12112(b)(5)(A).  In order to

29

establish a *prima facie* case of HFHS's failure to make the reasonable accommodations mandated by this ADA provision, Plaintiff must show (i) that she had a disability within the meaning of the ADA, (ii) that she was otherwise qualified for her job, and (iii) that HFHS refused to make a reasonable accommodation for her disability. *Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir. 1997). In the present motion, Defendants do not contest Plaintiff's showing as to the first two elements of this *prima facie* case, but rather focus exclusively on the third element.

As Defendants observe, Plaintiff bears the initial burden to propose an accommodation and show that it is objectively reasonable. *See Hedrick,* 355 F.3d at 457. In Defendants' view, Plaintiff has failed to meet the first of these burdens, as they contend that none of the communications from Plaintiff and her counsel during the course of her leave could properly be viewed as requesting any sort of accommodation. This argument, however, overlooks the November 16, 2009 letter from Plaintiff's attorney to Ms. Cafaro, which stated in pertinent part:

> Hopefully, Dr. Murphy's ability to return to work within the next two weeks will enable her to resume her previous position at Fairlane. If for some reason the replacement you refer to in your [November 10, 2009] letter has already started working in that position, please consider this letter as Dr. Murphy's request to be considered for any other available full-time position within the Gastroenterology Department, effective November 30, 2009.

(Plaintiff's Response, Ex. Q, 11/16/2009 Letter.)

Plaintiff asserts, and the Court agrees, that this letter may readily be construed as a request for an accommodation — namely, that if Plaintiff's prior position at HFHS's

Fairlane facility had been filled, she wished to be considered for any available gastroenterologist position at this or another facility.  As confirmation of this understanding, the record discloses that Plaintiff contacted Dr. Brown the very next day to arrange a meeting at which the two would discuss Plaintiff's anticipated return to work and the availability of gastroenterologist positions.[24]  More generally, Defendants cannot seriously suggest that they were unaware of Plaintiff's interest in being considered for any open gastroenterologist position upon her return from medical leave.  To the contrary, when Plaintiff ended her leave in April of 2010, HFHS claims to have looked into the availability of positions into which Plaintiff could be placed (and found that there were none), (*see* Defendants' Motion, Ex. 5, 5/11/2010 Letter), despite the absence of any evidence that Plaintiff explicitly requested such an inquiry.  Plainly, then, HFHS understood that Plaintiff remained interested in the accommodation sought in her attorney's November 16, 2009 letter, even after her anticipated November 30, 2009 return date had come and gone.[25]

---

[24]As noted earlier, Plaintiff has complained that it took Dr. Brown over two months to acknowledge this request and agree to a meeting.

[25]Plaintiff also suggests that her attorney's November 16, 2009 letter and other correspondence from her counsel and physicians during the course of her medical leave could be construed as requests for an accommodation of another sort — namely, requests for additional extensions of her medical leave.  *See Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775, 782-83 (6th Cir. 1998) (recognizing that a grant of medical leave may qualify as a reasonable accommodation under the ADA).  The Court, however, fails to see how this would bolster Plaintiff's failure-to-accommodate claim, where the record does not disclose any instance in which HFHS denied the requests of Plaintiff and her physicians to extend her medical leave.  To the contrary, this leave was extended on several occasions between its commencement in April of 2009 and its conclusion in April of 2010.

31

This leaves only the question whether Plaintiff's requested accommodation — *i.e.,* reassignment to an open gastroenterologist position — qualifies as a reasonable accommodation that HFHS refused to make.  The Court agrees with Defendants that it does not, at least under the facts presented here.  As discussed at length above, the record shows that there were no such open positions for gastroenterologists at any of HFHS's facilities at the time Plaintiff returned from her leave in April of 2010.  The law is clear that an employer's duty to accommodate under the ADA does not extend to "creat[ing] a position not then in existence," *Hoskins,* 227 F.3d at 729, nor must an employer "displace existing employees from their positions," *Burns v. Coca-Cola Enterprises, Inc.,* 222 F.3d 247, 257 (6th Cir. 2000).  Rather, "an employer need only reassign a disabled employee to a vacant position," *Burns,* 222 F.3d at 257, or perhaps consider the employee for a position that "will become vacant in a short period of time," *Monette,* 90 F.3d at 1187.

As observed earlier, while HFHS had available gastroenterologist positions in the fall of 2009, it had interviewed and extended offers for these positions by early December of 2009, and the last of these offers was accepted by early March of 2010, over a month before Plaintiff notified HFHS that she was ready to return to work.  The record also discloses that there were no further offers extended for gastroenterologist positions until late March of 2011, nearly a year after Plaintiff returned from her leave.  Under this record, Plaintiff's desired assignment to an available gastroenterologist position was not a "reasonable accommodation" as this term has been construed by the courts, and HFHS therefore was not obligated to make this accommodation.  *See Hoskins,* 227 F.3d at 729

(holding that the position reassignment requested by the plaintiff in that case was not a reasonable accommodation because the position at issue "was not available when [the defendant employer] learned of [the plaintiff's] disabling injury nor was its availability anticipated in the near future").

Plaintiff's various challenges to this conclusion largely track her arguments in support of her discrimination claim, and the Court disposes of these challenges on the same grounds set forth earlier.  First, she again points to the availability of positions at the time her attorney wrote his November 16, 2009 letter notifying HFHS that Plaintiff was "able to return to work . . . on November 30, 2009."  (Defendants' Motion, Ex. 34, 11/16/2009 Letter.)  As discussed earlier, however, this posited November 30, 2009 return date came and went without Plaintiff presenting herself as ready to return to work, and both Plaintiff's attorney and her physician notified HFHS in the interim that her medical leave would "have to be extended to February 1, 2010, possibly longer." (Defendants' Motion, Ex. 36, 11/25/2009 E-mail; *see also* Defendants' Motion, Ex. 37, 11/25/2009 Letter from Plaintiff's Physician.)  Plainly, the accommodation requested by Plaintiff — assignment to an available gastroenterologist position — could only be given once Plaintiff advised HFHS that she was ready to return to work, and the undisputed record establishes that this did not occur until mid-April of 2010.  Plaintiff has failed to suggest any reason why the availability of positions in November of 2009 should have a bearing on a duty to accommodate that first arose nearly five months later.  *See Gantt,* 143 F.3d at 1047 ("Reasonable accommodation does not require the employer to wait

33

indefinitely for an employee's medical condition to be corrected.").[26]

Plaintiff next reiterates her argument that a return to her former position at HFHS's Fairlane facility should be deemed a reasonable accommodation because this position was not actually filled until Dr. Aggarwal began working for HFHS in July of 2010, roughly two months after Plaintiff returned from her medical leave in late April. Yet, as discussed earlier, HFHS interviewed for this Fairlane position in the fall of 2009, and offered Dr. Aggarwal this position on November 23, 2009. Although there was a gap of several months between Dr. Aggarwal's acceptance of this position in January of 2010 and her actual start date, Dr. Brown testified without contradiction that this was an unavoidable byproduct of the ordinary process for interviewing and hiring physicians, like Dr. Aggarwal, who were completing their final year of a fellowship.

Plaintiff has failed to identify any case law or other authority that would require HFHS to deviate from this usual hiring process in order to satisfy its duty of reasonable

---

[26]In her brief in response to Defendants' motion, Plaintiff seeks to frame Defendants' position on this issue as advocating a rule that HFHS had no duty to accommodate unless and until Plaintiff produced a release from her physician attesting to her ability to return to work. Plaintiff then notes the absence of any HFHS policy requiring a written release from a physician before an employee may return from a medical leave. (*See* Plaintiff's Response Br. at 31.)

The Court views this question of a release as beside the point. With or without a release, if Plaintiff had presented herself to HFHS on November 30, 2009 as ready and able to return to work, the Court would readily conclude that HFHS's duty to accommodate would have arisen at that point, and that Plaintiff should have been considered for any gastroenterologist positions that were available at that time. This is not what happened, however. Instead, Plaintiff's attorney and physician advised HFHS prior to November 30, 2009 that Plaintiff would remain on leave until at least February 1, 2010. Plaintiff has not cited any authority for the proposition that an employer must go through the process of accommodating an employee whose return to work is said to be imminent, even if this purportedly imminent return never comes to pass.

34

accommodation under the ADA. Indeed, if such a rule were to apply here, it would have required HFHS to entirely forgo this process throughout the fall of 2009, even though the date of Plaintiff's return remained uncertain and was repeatedly extended, and even though this return, despite the hopes expressed by Plaintiff's attorney and physicians, did not actually come to pass until several months later. Neither has Plaintiff cited any authority suggesting that HFHS should have treated her former position as vacant or available, despite the fact that another individual had already been offered and had accepted this position. Rather, the pertinent case law instead indicates precisely the opposite, holding that the ADA's duty of reasonable accommodation does not mandate that an employer "displace existing employees from their positions." *Burns,* 222 F.3d at 257.

Finally, Plaintiff notes that HFHS's leave policy does not impose a fixed maximum upon the amount of leave an employee may be granted, and she suggests that HFHS could have extended her leave beyond a year in order to keep alive the possibility that a gastroenterologist position might yet become available. Again, however, the case law holds that an employer's duty of accommodation through reassignment extends only to available positions or position "that will become vacant within a reasonable amount of time." *Hoskins,* 227 F.3d at 729. An employer is "under no duty to keep employees on unpaid leave indefinitely until [a] position opens up." *Monette,* 90 F.3d at 1187. The record here reveals that the next gastroenterologist vacancy did not arise until nearly a year after Plaintiff returned from her medical leave, and no evidence suggests that any

35

such job opening was believed to be imminent when Plaintiff sought to return to work in April of 2010.  Accordingly, the Court finds that HFHS did not violate its duty of reasonable accommodation in this (or any other) respect.[27]

---

[27]In light of the Court's rulings, Plaintiff's federal ADA claims have been resolved and will not go forward.  Under these circumstances, where all of the federal claims have been dismissed, the Court elects not to retain and exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, *see* 28 U.S.C. § 1367(c)(3), and the Court likewise declines to address the challenges to these state-law claims advanced in Defendants' present motion. Rather, Plaintiff's state-law claims will be dismissed without prejudice.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants' April 6, 2012 motion for summary judgment (docket #35) is GRANTED IN PART, to the extent that it seeks an award of summary judgment in Defendants' favor as to Plaintiff's federal claims under the ADA, and is otherwise DENIED WITHOUT PREJUDICE.

<u>s/Gerald E. Rosen</u>
Chief Judge, United States District Court

Dated:  February 5, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 5, 2013, by electronic and/or ordinary mail.

<u>s/Julie Owens</u>
Case Manager